Paul Marron, Esq., State Bar No. 128245
Mark J. Polland, Esq., State Bar No. 210657
MARRON LAWYERS
320 Golden Shore, Suite 410
Long Beach, CA 90802
Tel.: 562.432.7422
Fax: 562.432.8682
E-mail: pmarron@marronlaw.com
E-mail: mpolland@marronlaw.com

Attorneys for LARRY JAMES;
DAVID R. BATTON; ANDRE DOUZDJIAN;
BATTON TECHNICAL ENGINEERING
CONSULTANTS, INC.; BATTON, INC.;
HANBON -- CARO I, LLC; HANBON --
MI I, LLC; HANBON MI II, INC.; HANBON --
MARLETTE, LLC; HANBON -- PA I, LLC;
TEC GROUP, INC.; DEPLOY HR, INC.;
DEPLOYHR, INC.

IN THE UNITED STATES DISCTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CORNERSTONE STAFFING SOLUTIONS, INC., a California Corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>LARRY THAXTER JAMES an individual; DAVID R. BATTON, an individual; TED MANNELLO, an individual; ANDRE DOUZDJIAN, an individual; MICHAEL JAMES, an individual; MARCOS BARRERA, an individual; BATTON TECHNICAL ENGINEERING CONSULTANTS, INC., a Michigan corporation; BATTON DIVERSIFIED STAFFING SOLUTIONS, a Michigan corporation; HANBON- CARO I, LLC, a Michigan limited liability company a/k/a CARO I, LLC; HANBON -- MI I, LLC, a Michigan limited liability company d/b/a TECHNICAL ENGINEERING CONSULTANTS; HANBON -- MI II, INC., a Michigan corporation d/b/a BATTON TECHNICAL ENGINEERING CONSULTANTS; HANBON -- MARLETTE, LLC, a Michigan limited liability | Case No.: 3:12-cv-01527-RS<br><br>Assigned to Hon. Richard Seeborg<br><br>**LARRY JAMES' *EX PARTE* APPLICATION FOR AN ORDER SHORTENING TIME FOR MOTION TO AMEND PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES; SUPPORTING DECLARATIONS WITH EXHIBITS; AND [~~PROPOSED~~] ORDER**<br><br>Complaint Filed:  March 27, 2012<br>Trial Date:         October 28, 2013 |

company; HANBON -- PA I, LLC a Pennsylvania
limited liability company; HANBON - CT I, LLC a
Connecticut limited liability company; TEC GROUP
INC., a Michigan corporation d/b/a TEC GROUP
ALSO d/b/a TEC-CHRYSLER; DEPLOY HR,
INC., a Pennsylvania corporation d/b/a DEPLOY
HR STAFFING, INC.; DEPLOYHR, INC., a
California corporation d/b/a TEC ALSO d/b/a
BATTON; and DOES 1- 100,

                    Defendants.

_____

AND RELATED COUNTERCLAIMS

_____

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

    Larry James submits this *ex parte* application ("Application") with notice to all parties to shorten time for the hearing on his motion ("Motion") to amend the Preliminary Injunction. The hearing on the Motion is currently scheduled for December 20, 2012. Mr. James requests the Court to set the hearing for November 29, 2012, at 1:30 p.m., or the earliest available date.

    This Application is made pursuant to Northern District of California District Court Local Rule 7.10, *Federal Rules of Civil Procedure* Rule 6(c)(1)(C), and the applicable case law. See, *e.g., In re Intermagnetics America, Inc.,* 101 B.R. 191, 193 (C.D. Cal. 1989). This Application is made on the ground that good cause exists because Mr. James will be irreparably harmed if this Application to shorten time on the underlying motion is not granted, and Mr. James is without fault in creating these circumstances.

    This Application is based on this Notice of Application, the Memorandum of Points and Authorities, the declarations of Mark Polland, Larry James and Lori Kwan and exhibits thereto, the Court's entire file in this matter, the argument of counsel at hearing, and on such other and further evidence and argument as the Court may allow.

Dated: November 13, 2012                    MARRON LAWYERS

                                            By: /s/ Paul Marron
                                            Paul Marron, Esq.
                                            Mark J. Polland, Esq.
                                            Attorneys for LARRY JAMES

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

**1.    INTRODUCTION.**

On November 9, 2012, Larry James filed a motion ("Motion") to amend the Preliminary Injunction in the above entitled matter.  The Motion was prompted by the discovery that Hewlett Packard ("HP") intends to offer a Request for Proposals ("RFP") for companies to prequalify with HP. James Decl., ¶ 4; Kwan Decl., ¶¶ 6 and 18.  Only prequalified companies can submit candidates for employment at HP. James Decl., ¶ 3; Kwan Decl., ¶¶ 1-5.

Mr. James wants to apply for prequalification with HP.  However, HP is on CornerStone Staffing Solutions, Inc.'s ("CornerStone") customer list. Polland Decl., ¶ 1.  The Preliminary Injunction, as currently written, prohibits Mr. James from soliciting customers on CornerStone's customer list.  That is the subject of the underlying Motion.  The sole issue in this *ex parte* application ("Application") is Mr. James' request to shorten time for the hearing on that Motion. Prequalification with HP could result in a significant source of revenue for Mr. James.  HP's RFP may be issued any day. Kwan Decl., ¶¶ 6 and 18.  Once it is issued, there is a short time to apply, usually about two weeks. Kwan Decl., ¶¶ 1-5.  If the underlying Motion is not heard on shortened time, Mr. James may lose out on the opportunity to apply before the hearing.  CornerStone refuses to stipulate to shorten time for the hearing.  Therefore, it is necessary to make this Application on an *ex parte* basis.  Notice is being served to all parties.

Mr. James requests the Court to set the hearing for November 29, 2012, at 1:30 p.m., or the earliest available date.  In the alternative, Mr. James requests the Court to set the hearing for December 13, 2012, at 1:30 p.m., because all parties will be in court on that date for the hearing on Defendant's motions to dismiss CornerStone's First Amended Complaint and the next Case Management Conference.

**2.    STATEMENT OF FACTS.**

**A. This Opportunity First Arose in Late October.**

Lori Kwan is an employee of Mr. James. James Decl., ¶ 4; Kwan Decl., ¶ 15.  In late October 2012, Ms. Kwan was contacted by a representative of HP who informed her that HP

1

would soon offer an RFP for staffing companies to prequalify as service providers to HP. Kwan Decl., ¶¶ 6 and 18.  Ms. Kwan notified Mr. James accordingly. Kwan Decl., ¶¶ 6 and 18.

Mr. James wants to apply for prequalification with HP.  Accordingly, Mr. James filed his Motion to amend the Preliminary Injunction on November 9, 2012.  The Motion is set for hearing on December 20, 2012.  If the time for the hearing is not shortened it is likely HP will offer its RFP, and the deadline for applying will pass before the regularly noticed hearing date.

Under the Preliminary Injunction, Mr. James cannot apply for prequalification with HP because HP is on CornerStone's customer list. Polland Decl., ¶ 1.  However, as Mr. James argues in his underlying Motion, there is good cause to amend the Preliminary Injunction to allow Mr. James to apply for prequalification because CornerStone has no exclusive right to that work.  HP offers its RFP's to multiple staffing companies on a competitive basis. Kwan Decl., ¶¶ 1-5. CornerStone will have to re-apply for prequalification under the new RFP also, and there is no guarantee CornerStone will qualify.  Moreover, HP's representative specifically contacted Ms. Kwan and asked her to apply. Kwan Decl., ¶¶ 6 and 18.

**B.  Prior Modifications as to Time.**

The parties stipulated to four continuances in this matter: 1) to continue the time for Defendants to Answer to CornerStone's Complaint; 2) to continue the hearing on Defendants' Motion to Dismiss CornerStone's FAC; 3) to continue the deadlines for the Opposition and Reply to the Motion to Dismiss CornerStone's FAC, which was jointly filed with the second stipulation on September 21, 2012; and 4) to advance the date of the Case Management Conference. Polland Decl., ¶ 2.  Per CornerStone's *ex parte* application, the Court continued the deadline to complete the settlement conference. Polland Decl., ¶ 2.  Shortening time for the Motion will not significantly effect the litigation. Polland Decl., ¶ 3.

**3.  <u>ARGUMENT.</u>**

**A.  The Court Can Shorten Time for the Hearing on an *Ex Parte* Basis.**

The Local Rules for the Northern District of California provide for *ex parte* relief where permitted by law. N.D.Cal. L.R. 7-10.  *Federal Rules of Civil Procedure* Rule 6(c)(1)(C) specifically provides that a party may apply *ex parte* to set a different time for a hearing: "when a court order—which a party may apply for ex parte—sets a different time."  In *In re Intermagnetics*

2

*America, Inc.,* 101 B.R. 191 (C.D. Cal. 1989), the Court expressly recognized that an appropriate use of an *ex parte* application is "to shorten the time within which a motion may be brought." *Intermagnetics*, 101 B.R. at 193; see also Cal. Practice Guide, *Federal Civil Procedure Before Trial* (The Rutter Group 2012) 12:162, 12:170.1.

### B.   A Delay in the Hearing May Cause Mr. James to Lose a Valuable Opportunity.

Prequalifying with HP would allow Mr. James to submit candidates for openings at HP. That could result in a significant source of revenue for Mr. James.  However, the RFP is expected to be announced any day.  After HP announces an RFP, the deadline for applying will likely be about two weeks.  If the Motion is heard pursuant to regular notice, the deadline to apply for HP RFP's will likely end and that opportunity will be lost.

### C.   Losing a Valuable Business Opportunity Is Good Cause for *Ex Parte* Relief.

> What showing is necessary to justify ex parte relief? First, the evidence must show that the moving party's cause will be irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures. Second, it must be established that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect. *Mission Power Engineering Co. v. Continental Cas. Co.*, 883 F.Supp. 488, 492 (C.D.Cal.,1995).

There is good cause for this Application.  Mr. James will lose the opportunity to prequalify with HP if the Motion is not heard until after the deadline to apply.  The staffing industry is highly competitive.  To compete effectively, staffing companies cannot afford to allow valuable opportunities to pass.  Prequalifying with HP could result in significant revenue for Mr. James. HP offers RFPs only periodically, approximately every one to three years.  If Mr. James' misses this opportunity, he will be precluded from bidding on HP contracts until another RFP is issued. That could take three years or more.  That would prevent Mr. James from competing on a fair playing field and cause irreparable harm to his business.  Secondly, Mr. James is without fault.  He cannot control when the RFP is announced.  Therefore, there is good cause for *ex parte* relief.

### D.   Mr. James Requests the Hearing for November 29 or the Earliest Date Available.

Mr. James respectfully requests this Court to shorten the time for the hearing on the motion so that it can be heard on November 29, 2012.  November 29 is a Thursday, which the designated

3

day for civil law and motion in this department pursuant to the Court's standing order.  That date would allow CornerStone the full time (2 weeks) to respond to the underlying Motion in accordance with the Local Rules. N.D.Cal. L.R. 7-3.  In addition, the parties have a Settlement Conference in this matter set for the very next day, November 30, 2012.  Mr. James is willing to shorten the time for him to reply or waive a written reply if necessary.  In the alternative, Mr. James requests the Court to set the hearing for the earliest available date.  At minimum, Mr. James requests the Court to set the hearing for December 13, 2012, the date all parties will be in court for the hearing on Defendants' motions to dismiss CornerStone's FAC and the next Case Management Conference.

**E.  The Parties Have Met and Conferred.**

The parties have met and conferred on the issue of shortening time for the Motion.  Copies of the email exchange between counsel on this issue are attached. Polland Decl., ¶¶ 4-7, Ex's "1" through "4" pp. 16-20.  Counsel discussed this matter by phone on November 12, 2012. Polland Decl., ¶ 6.  CornerStone refused to stipulate because:  1) Neil Martin, CornerStone's lead attorney, was in trial, and 2) CornerStone needed the evidence to review in advance. Polland Decl., ¶ 5, Ex. "2", pp. 17-18.

**F.  Mr. James Proposes November 29 for the Hearing to Accommodate CornerStone.**

Mr. James is proposing to set the hearing on November 29, 2012, in part to accommodate CornerStone's request for the full time to respond to the underlying Motion.  CornerStone has had the Motion, which includes the relevant evidence, since November 9.  If the hearing is set for November 29 CornerStone will have its full two weeks to respond.  Mr. James is willing to shorten the time for his reply to two days or waive a written reply if necessary to facilitate the shortened time he is requesting for the hearing.

**G.  Mr. James Requests Shortened Time Regardless of Counsel's Trial Calendar.**

Prequalification with HP is a major opportunity for Mr. James, and it is important that the time for the hearing is shortened so that he does not miss that opportunity before it is gone.  With a November 29 hearing, CornerStone will have the full time permitted under law to respond. The firm representing CornerStone is Hill Farrer & Burrill, LLP ("HFB").  According to its website, HFB has over 40 lawyers, most of them very experienced.  Clay Hix from HFB is actively

4

1    involved in this litigation.  According to HFB's website, Mr. Hix is an attorney with seven years

2    of experience who was formerly an extern for a United States District Judge in the Central District

3    of California.  Mike DiBiase is another attorney from HFB who has been involved in this case

4    from the start.  He has been an attorney for CornerStone for many years.  While Mr. DiBiase

5    focuses on transactional matters, not litigation, he has over 35 years of experience and there is no

6    reason he could not represent CornerStone at a hearing.  CornerStone should not be permitted to

7    delay the hearing on Mr. James' motion simply because one of its attorneys is unavailable.

**4.    CONCLUSION.**

For all the foregoing reasons, the Court should grant this Application and set the hearing

on the underlying Motion for November 29, 2012, or at the Court's earliest availability.

Dated: November 13, 2012              Respectfully submitted,
                                      MARRON LAWYERS


                                      By: /s/ Paul Marron
                                      Paul Marron, Esq.
                                      Mark J. Polland, Esq.
                                      Attorneys for LARRY JAMES

5

### DECLARATION OF MARK POLLAND

I, Mark Polland, declare and state as follows:

I am an attorney for Larry James in the above entitled matter.  I know all of the following of my own personal knowledge and if called to testify, I could and would testify competently thereto.

1.    Under the Preliminary Injunction currently in effect in this matter, Mr. James cannot apply for prequalification with HP because HP is on CornerStone's customer list.

2.    The parties have stipulated to three continuations of time in this matter: 1) to continue the time for Defendants to Answer to CornerStone's Complaint, which was filed May 5, 2012; 2) to continue the hearing on Defendants' Motion to Dismiss CornerStone's First Amended Complaint; 3) to continue the deadlines for the Opposition and Reply to the Motion to Dismiss the First Amended Complaint, which was jointly filed with the second stipulation on September 21, 2012; and 4) to advance the date of the Case Management Conference.  In addition, pursuant to CornerStone's *ex parte* application, the Court continued the deadline to complete the settlement conference.

3.    The modification (shortening time) requested in this Application would not have a significant effect on the litigation but could prevent irreparable harm to Mr. James.

4.    On November 7, 2012, I sent an email to counsel for Cornerstone Staffing Solutions, Inc. ("CornerStone") to meet and confer regarding Mr. James' proposed *ex parte* application to shorten time for the hearing on Mr. James' underlying motion ("Motion") to amend the Preliminary Injunction.  A true and correct copy of that email is attached as Exhibit "1", p. 16.

5.    On November 9, 2012, in an email, counsel for CornerStone responded via email to my email of October 22.  A true and correct copy of that email is attached as Exhibit "2", pp. 17-18.

6.    On November 12, 2012, I sent another email to counsel that addressed this issue.  A true and correct copy of the email is attached as Exhibit "3", p. 19.  On the same day, I had a phone call with counsel for CornerStone to discuss the issue of shortening time on the underlying Motion.

6

026182/2012-1070

7.    On November 12, 2012, counsel for CornerStone responded via email to my email of October 22.  A true and correct copy of that email is attached as Exhibit "4", p. 20.

8.    No resolution regarding this Application to shorten time was reached.

9.    The accompanying *Ex Parte* Application is made in good faith and for good cause.

Executed in Long Beach, California this 13th day of November 2012.

Mark Polland

7

# DECLARATION OF LARRY JAMES

I, Larry James, declare and state as follows:

1. I am a defendant in the above entitled matter. I know all of the following of my own personal knowledge and if called to testify, I could and would testify competently thereto.

2. I was CornerStone's Managing Director from its inception in 2003 until my termination on March 30, 2012. The staffing industry is highly competitive. Nevertheless, I never agreed to not compete with CornerStone for business following his separation from CornerStone.

3. I know that CornerStone has had contracts with HP in the past but I do not know whether CornerStone has any contracts with HP that are continuing as of this date.

4. HP uses a Request for Proposal ("RFP") process to prequalify staffing companies to be eligible to submit applicants for employment positions.

5. I heard about an anticipated RFP from HP Canada through Lori Kwan, a current employee of Deploy HR, Inc. ("Deploy"), a company I own.

6. I was introduced to Ms. Kwan while I was the Managing Director of CornerStone. I met in the context of negotiations involving the potential purchase of Trinite, Ms. Kwan's company, by CornerStone. The purchase was consummated, and Ms. Kwan became a CornerStone employee. CornerStone had no business relationship with HP prior to the acquisition of Trinite, but HP's contracts (and prequalification entitlement) with Trinite were included in CornerStone's purchase of Trinite.

7. Ms. Kwan's role at CornerStone was to manage the accounts that CornerStone acquired through the purchase of Trinite.

8. At Ms. Kwan's request, I removed Gina Stork as Ms. Kwan's direct supervisor at CornerStone because Ms. Kwan found Ms. Stork to be disrespectful.

9. After my termination, Ms. Kwan and I remained in contact while she worked at a company called Formula Resources, Inc. ("Formula"). We spoke by telephone about once a month. Our discussions included social and personal matters as well as professional matters on occasion. I never solicited Ms. Kwan to come work for Deploy Hr, Inc. However, Ms. Kwan wanted to work with me again. Once she decided to leave Formula, she told me that she would soon be available and that she would be interested in working with me again if such opportunity

8

1  became available.  A short time thereafter, Ms. Kwan left Formula and went to work for Deploy

2  Hr, Inc.

3      10.      Since the Preliminary Injunction was issued, I have not made any attempt to

4  contact HP or any of the other companies on CornerStone's customer list for the purpose of

5  soliciting business for his staffing companies, and I have instructed my associates and employees

6  to do the same. I did nothing to solicit information regarding HP's RFP.

7

8      Executed in Pleasanton, California, this 9th day of November, 2012.

9

10

11                                                    _____
                                                      Larry James

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF LORI KWAN

I, Lori Kwan, declare and state as follows:

I am a California resident over the age of 18.  I am an employee of Deploy HR, Inc., a defendant and counterclaimant in the above entitled matter.  I know all of the following of my own personal knowledge except for those matters stated to be based on information and belief and as to those matters I believe them to be true, and if called to testify, I could and would testify competently thereto.

1.      Hewlett Packard ("HP") uses a Request for Proposal ("RFP") process to prequalify staffing companies to be eligible to submit applicants for employment positions.  The companies that successfully prequalify receive notifications of employment opportunities at HP.  Each prequalified company may submit up to three candidates for each position HP advertises.  There is no guarantee that a prequalified company will actually place any employees at HP.

2.      HP sets the employee salary and the fee to the staffing company, so there is no competition based on price.  All of the prequalified companies are on equal footing in that regard.  The competition is based on the qualifications of the candidates, as well as their fit with the company in general and with the offered position in particular.  Once a contract is awarded, the successful staffing company is entitled to the fee for that contract, but nothing further.

3.      Staffing companies do not remain on HP's list of prequalified suppliers forever.  Once HP issues an RFP, all staffing companies, including staffing companies who were previously prequalified, must apply if they want to be considered for prequalification.  The fact that a company was previously prequalified is no guarantee that it will successfully prequalify again.  HP offers RFPs for prequalification periodically with no set time between RFPs.

4.      Upon information and belief, I believe HP sends notifications of its RFPs via email to companies that were previously prequalified, as well as other companies that HP would like to apply.  In addition, any company that wants to apply can simply contact HP.  HP is one of the largest contractors for technical staffing personnel in North America.  The availability of staffing opportunities at HP are well known throughout the staffing industry.   HP is contacted by prospective staffing companies to identify those opportunities on a continual basis.

5.      HP Canada prequalifies staffing companies through its own RFPs, separate from RFPs issued by HP U.S.  There are approximately 10 prequalified staffing companies for HP Canada at any given time.

6.      Upon information and belief, I learned that HP would offer a RFP within a matter of weeks.  I told Larry James about the upcoming RFP from HP.

7.      Before coming to Deploy, I founded a staffing company called Trinite, Inc. ("Trinite", pronounced "trinity") which is located in Northern California.  I am an experienced executive in the staffing industry.  My specialty involves placing personnel in technical engineering positions.  HP Canada was one of Trinite's primary clients.   I was the one who initially applied for and obtained prequalification for Trinite from HP Canada.

8.      I was introduced to Mr. James while he was the Managing Director of CornerStone Staffing Solutions, Inc.'s ("CornerStone").  We met in the context of negotiations involving the potential purchase of Trinite by CornerStone.  The purchase was consummated, and I became a CornerStone employee.

9.      Upon information and belief, CornerStone had no business relationship with HP prior to the acquisition of Trinite, but HP's contracts (and prequalification entitlement) with Trinite were included in CornerStone's purchase of Trinite.

10.     Throughout the negotiations for the purchase of Trinite, I developed a very high regard for Mr. James and his professional abilities.  The fact that Mr. James was the Managing Director of CornerStone was one of the main reasons that I decided to work as an employee for CornerStone following the purchase of Trinite.  My role at CornerStone was to manage the accounts that CornerStone acquired through the purchase of Trinite.

11.     During the time that I worked for CornerStone, Gina Stork was CornerStone's Executive Director of Sales and Services.   I believe she is currently CornerStone's Chief Operating Officer.  Ms. Stork was originally my direct supervisor at CornerStone.  From the beginning, I found Ms. Stork to be disrespectful and to lack a fundamental understanding of the staffing business.  I observed on a daily basis that Ms. Stork was disrespectful, unprofessional, and outright insulting in communications with coworkers, and more specifically with employees she

11

was supervising.  She regularly said of CornerStone's own in house employees that "*A monkey could do that job.*"  I discussed the issue with Mr. James on multiple occasions.  After each conversation Ms. Stork's behavior would improve for a short time but then quickly revert.  Eventually, at my request, Mr. James removed Ms. Stork as my direct supervisor.  After that, I reported directly to Mr. James.  After Mr. James' termination from CornerStone, I again had to report to Ms. Stork.  At that time, without Mr. James there to intervene, Ms. Stork's behavior toward me became increasingly intolerable.

12.     In or around June 2012, I received a call from Ms. Anderson.  It was the first time I had ever spoken to Ms. Anderson.  Ms. Anderson insisted that I attend a meeting in CornerStone's Sacramento office with her and Ms. Stork.  That was the only time I ever met Ms. Anderson in person.  I was not clear on the reason for the meeting until about a week later when Ms. Anderson asked me and the only two other employees who worked exclusively on the Trinite accounts to attend another meeting in Sacramento with a woman named "Margaret."  I do not recall Margaret's last name.  At that meeting, I realized that Margaret had been brought in to replace me on the Trinite accounts.  Ms. Stork contacted me within a few days after that meeting and told me I could no longer use the title of Director because Margaret wanted that title.  I understood at that point that my termination from CornerStone was imminent.  As a result, I decided to look for other employment and resigned from CornerStone shortly thereafter.

13.     As a professional courtesy, when I left CornerStone, I sent an email to all of my contacts, both within and outside CornerStone, to let them know I was leaving.  Otherwise, those people may have continued to contact me at that email address expecting a response, which could have resulted in lost business or other missed opportunities for CornerStone.  In that email, I did not explain why I was leaving or where I was going, nor did I solicit any employees or customers to go with me.

14.     After leaving CornerStone, I went to work for another staffing company, Formula Resources, Inc. ("Formula"), which is also located in Northern California.  To my knowledge, Formula did not share any customers with CornerStone and was not in direct competition with CornerStone.  I was optimistic about working for Formula because I was led to believe that I

would be gaining knowledge in different aspects of the staffing industry that were new to me, and that other opportunities and benefits would arise.  After about three months at Formula, I found that I was not gaining the knowledge or other opportunities I understood I would have at Formula.  As a result, I decided to look for other employment.

15.     Throughout the time I was working at Formula I remained in contact with Mr. James.  We spoke by telephone about once a month.  Our discussions included social and personal matters as well as professional matters on occasion.  Mr. James never solicited me to come work for Deploy Hr, Inc ("Deploy").  However, I wanted to work with Mr. James again.  Once I decided to leave Formula, I told Mr. James that I would soon be available and that I would be interested in working with Mr. James again if such opportunity became available.  A short time thereafter, I left Formula and went to work for Deploy.  To my knowledge, Deploy does not share any customers with Formula, and they are not in direct competition.

16.     I have known Denis Meuret for about ten years, long before CornerStone acquired Trinite.

17.     I am informed and believe Mr. Meuret is an employee of Manpower, Inc. ("Manpower"), a staffing company that is a service provider to HP Canada.  Mr. Meuret is currently on assignment with HP Canada.  Although Mr. Meuret is technically an employee of Manpower, which competes with other staffing companies for HP's business, Mr. Meuret's assignment at HP is to oversee technical engineering personnel placed at HP by outside staffing companies.  As a result, he has a vested interest in obtaining the best personnel for those positions.

///

///

///

1    18.    In late October 2012, Mr. Meuret contacted me and told her that HP might offer an
2    RFP for a prequalification "within the next few weeks." Mr. Meuret was one of the people who
3    received an email notification from me when I resigned from CornerStone. He contacted me
4    through my personal contact information. He knew that I had left CornerStone but he was
5    unaware that I had gone to work for Deploy. He told me that I was one of the best staffing
6    providers that HP had, and he encouraged me to apply for the anticipated RFP. To the best of my
7    knowledge, Mr. Meuret is not specifically tasked with finding qualified staffing companies to
8    apply for prequalification with HP, however, HP does have an in-house team dedicated to that
9    purpose. I did nothing to solicit any information from Mr. Meuret or HP. After receiving that
10   information from Mr. Meuret, I took no further action other than to notify Mr. James accordingly.
11   I did nothing to solicit information regarding HP's RFP.

12       Executed in Palo Alto, California this 9th day of November 2012.

13

14

15                                                       Lori Kwan

16

17

18

19

20

21

22

23

24

25

26

27

28

14

1

### [PROPOSED] ORDER

2      The Court in the above-entitled matter, having read and considered Larry James'

3  Application for an order shortening time on his underlying motion ("Motion") to amend the

4  Preliminary Injunction in this matter, finds that there is good cause to shorten time for the hearing

5  on the Motion and therefore grants the Application.  The hearing on the Motion is set for:

6      November 29, 2012, at 1:30 p.m., or on __December 13_____ (date), 2012, at _1:30pm_(time).

7      Any opposing papers are due by November 26, 2012, or _____ (date)

8      Any reply is due by November 28, 2012, or _December 3, 2012_(date)

9      All opposing and reply papers shall be filed and served to all parties through the Court's

10 CM/ECF system.

11     **IT IS SO ORDERED.**

12

13 Date: __11/15/12_____          _____

14                                    The Honorable Richard Seeborg
                                       Judge of the United States District Court

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15