IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CORNERSTONE STAFFING SOLUTIONS, INC., a California corporation,

    Plaintiff,

  v.

LARRY THAXTER JAMES, an individual; *et al.*,

    Defendants.

_____

AND RELATED COUNTER-CLAIMS.

_____

No. C 12-01527 RS

**ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Counter-defendants CornerStone Staffing Solutions Inc. and Mary Anderson move for partial summary judgment of numerous counterclaims filed by defendant Larry James: the first (breach of contract), second (fraud), third (wrongful termination) fifth (violation of labor code § 970), eighth (unjust enrichment), ninth (breach of contract), fourteenth (constructive trust), sixteenth (breach of fiduciary duty), and seventeeth (accounting) counterclaims. Resolution of this motion, which was filed in June 2013, has been delayed by several intervening events. First, the motion was stayed so that James could attempt to reopen his personal bankruptcy proceedings. Then, after a

hearing in October 2013, a decision was further withheld while the bankruptcy court fielded competing bids for ownership of estate assets bearing on the viability of the underlying counterclaims. The parties having resolved the ownership of the disputed estate assets, counter-defendants' motion can now be resolved; for the following reasons, it is granted in part and denied in part.

## II. BACKGROUND

Much of the factual background of this long-running dispute is set forth in the prior order on motions for summary judgment filed by defendants James, Marcos Barrera, and David Batton. (*See* Order Granting in Part and Denying in Part Partial Motions for Summary Judgment, October 21, 2013, ECF No. 223). Because James' prior motion focused on many of the same facts underlying the present motion, this order will not recount relevant facts already summarized in the aforementioned order. Additional salient facts are summarized below.

### A. Ownership and Employment Contracts

CornerStone and James disagree as to the terms of his employment. James alleges his tenure at CornerStone was premised on several oral contracts formed between him and Anderson, his aunt. The company disputes the existence of these agreements, but for the purpose of this motion assumes their existence. First, James claims Anderson promised eventually to sell CornerStone and give him fifty percent of the proceeds, regardless of the duration of his employment. He also alleges that in exchange for his service as manager, Anderson (on behalf of CornerStone) promised him a yearly salary and a percentage of the firm's corporate profits exceeding $500,000. According to James, Anderson repeated these promises on a yearly basis throughout his tenure at the firm.

The only written evidence of an agreement between James and Anderson is a document, titled "Structure of Agreements with Larry," faxed from Anderson to James on February 5, 2003. The unsigned document contains several provisions that differ from the oral contract terms alleged by James. In particular, it states that James "has to stay through the sale and transition of the company" in order to receive a percentage of CornerStone profits and sale proceeds. It also classifies Anderson's contribution to the company as an "investment" that must be returned to her upon its sale. Further, it states Anderson is entitled to a 25% annual return on her contributions to

the firm. Although James acknowledges receiving this fax, he denies assenting to its terms. He contends the parties' true agreement, which was not in writing, called for the eventual good-faith negotiation of various non-material terms, such as the percentage of Anderson's return on her contribution.

### B. Sunbury House

James also alleges that in early 2005 he formed an oral agreement with Anderson concerning a home in Northern California ("Sunbury House"). According to James, the parties agreed to the following terms: (1) Anderson would buy the house, (2) James and his family would inhabit the house and pay a portion of the mortgage, and (3) Anderson would put James' name on the title to the home so that he could claim the mortgage payments as a tax deduction. As a result of this agreement, James contends, he moved his family into the house, made improvements on the home, and spent four years paying monthly rent to Anderson. Anderson, however, never placed James' name on the title. In 2008, upon realizing that Anderson would not be fulfilling her obligations under the alleged bargain, James and his family moved out.

### C. James' Bankruptcy

In October 2005, James voluntarily filed for Chapter 7 bankruptcy relief in the Northern District of California. *See In re Larry Thaxter James*, Case No. 05-48683 (Bankr. N.D. Cal. 2005). His requisite schedules of assets and liabilities, which were submitted under penalty of perjury, did not mention any interest in CornerStone or any right to receive profits from the company. One schedule required James to disclose "[s]tock and interests in incorporated and unincorporated businesses;" "[i]nterests in partnerships or joint ventures;" "[e]quitable or future interests;" and "[o]ther contingent and unliquidated claims of every nature." Under each field, James listed "NONE." (ECF No. 159, Exh. A).[1] James claims, however, that he told his lawyer—who prepared the requisite schedules—about his interest in the company. He also insists in a submitted declaration that he "did not intend to deceive anyone." (James Decl., ECF No. 203, ¶ 2). Further, he maintains that his interest in CornerStone had no value at the time of his bankruptcy filing. *Id.*

---

[1] Both parties request judicial notice of James' bankruptcy schedules. As the content of these publicly-available documents is not subject to dispute, judicial notice is appropriate. *See* Fed. R. Evid. 201.

After CornerStone filed the present motion for summary judgment, James informed the bankruptcy trustee about his omission. The trustee reopened the bankruptcy proceedings, after which point James filed an amended schedule reflecting his claimed interest in CornerStone and his oral contract with Mary Anderson. In Schedule B, requiring disclosure of "Interest in partnerships or joint ventures," James listed "Contingent interest in CornerStone Staffing Solutions, Inc." (ECF No. 204, Exh. C). In his amended Schedule G, requiring the disclosure of executory contracts, James listed "Agreement to work as Manager of CornerStone in exchange for 50% share of net profits in and Sale Proceeds of CornerStone." (ECF No. 204, Exh. D).

James then attempted to purchase these newly-listed interests ("the amended interests") from the bankruptcy trustee. His plan failed, however, after CornerStone objected to James' proposal. The bankruptcy court ordered that the amended interests be sold at auction to the highest bidder. The court's order described the auctioned assets as follows:

> [A]ny interest of the Debtor in Cornerstone and in any claims the estate has against Cornerstone and Anderson, including the estate's interest in all claims that were alleged or that could have been alleged by the Debtor in the action pending in the United States District Court for the Northern District of California bearing case no. 3:12-cv-01527 RS[.]

(Order Re: Disposition of Certain Estate Assets by Auction, Dec. 17, 2013, ECF No. 266, Exh. 9 ¶ 1). The bankruptcy court further explained that it was offering no conclusion on the nature, value, or validity of James' newly-listed interests:

> To further clarify, the Trustee will sell all of the estate's right, title and interest in and to the Assets, without representations or warranties of any kind. The sale shall be in the nature of a "quitclaim" and the Bankruptcy Court is not ruling, or intending to rule on the merits of any claims between the Debtor, Cornerstone and Anderson, whether such claim is pending in the District Court action between them, or otherwise.

(*Id.* at ¶ 2). The auction, which occurred January 13, 2014, did not go as James had likely planned. CornerStone, having tendered the highest bid, purchased the above-described assets from the bankruptcy trustee.

### III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. Proc. 56(c)(1)(A). If the movant succeeds, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3; *see also* Fed. R. Civ. Proc. 56(c)(1)(B). A genuine issue of material fact is one that could reasonably be resolved in favor of the nonmoving party, and which could "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *See id.* at 255. The Ninth circuit has long recognized "that summary judgment is singularly inappropriate where credibility is at issue." *S.E.C. v. M & A W., Inc.*, 538 F.3d 1043, 1054-55 (9th Cir. 2008) (quoting *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 699 (9th Cir.1978)).

### IV. DISCUSSION

A. Judicial Estoppel

ConerStone first argues that many of James' claims are foreclosed by judicial estoppel. Because James failed to disclose any interest in CornerStone during his 2005 bankruptcy proceeding, CornerStone contends he is estopped from proceeding on any claim premised on such an interest.

Judicial estoppel is an equitable doctrine that may be invoked by a court at its discretion. *New Hampshire v. Maine*, 532 U.S. 742 (2001). It "precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 792 (9th Cir. 2001). Courts apply judicial estoppel "not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings, and to protect against a litigant playing fast and loose with the courts." *Id.* (internal quotations omitted). When a plaintiff seeks to vindicate an interest

that was omitted from a relevant bankruptcy filing, this doctrine "serves to protect the bankruptcy system, which depends on full and honest disclosure by debtors of all their assets." *Yoshimoto v. O'Reilly Auto., Inc.*, 2011 WL 2197697 (N.D. Cal. June 6, 2011) *amended*, 2011 WL 2669604 (N.D. Cal. July 7, 2011) (citing *Hamilton*, 270 F.3d at 785). Although the doctrine is "probably not reducible to any general formulation of principle," courts generally rely on three factors when determining whether judicial estoppel should apply: (1) whether the party's later position is "clearly inconsistent" with its earlier position, (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled," and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750 (quotation omitted).

Judicial estoppel may be inapplicable, however, if the party's prior position was based on "mistake or inadvertence." *Id.* In the bankruptcy context, this means a plaintiff-debtor *may* avoid judicial estoppel by reopening the bankruptcy proceeding and correcting her initial filing error. *See Ah Quin v. County of Kauai Dept. of Transp.*, 2013 WL 3814916 (9th Cir. 2013). In these circumstances, the Ninth Circuit provides:

> "[J]udicial estoppel requires an inquiry into whether the plaintiff's bankruptcy filing was, in fact, inadvertent or mistaken, as those terms are commonly understood. Courts must determine whether the omission occurred by accident or was made without intent to conceal. The relevant inquiry is not limited to the plaintiff's knowledge of the pending claim and the universal motive to conceal a potential asset—though those are certainly factors. The relevant inquiry is, more broadly, the plaintiff's subjective intent when filling out and signing the bankruptcy schedules."

*Id.* at *7. Although James reopened his bankruptcy, filed amended schedules listing a claimed interest in CornerStone, and submitted a declaration stating that the omission was made without any intent to conceal, CornerStone nonetheless contends that James "cannot avoid" judicial estoppel. (Counter-Defendants' Reply, ECF No. 208, 1:20). CornerStone argues that James' declarations and deposition testimony are so rife with inconsistencies that no further factual development is needed to divine James' "subjective intent" to deceive. *See Ah Quin*, 2013 WL at *7. The company notes,

for example, that James gave an interrogatory response stating that by December 2005, just a few months after his bankruptcy filing, he knew CornerStone was generating "substantial profits." This statement is in tension with James' current position that CornerStone was valueless in October 2005 when he filed for bankruptcy.

Yet while CornerStone's motion underscores several evidentiary incongruities, fairly calling into question James' veracity, it fails to establish that his most recent affidavit is a "sham" that should be disregarded at summary judgment. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (the "sham affidavit" rule prevents "a party who has been examined at length on deposition" from "rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony."). The Ninth Circuit has cautioned that the sham affidavit rule "should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2026, 185 L. Ed. 2d 886 (U.S. 2013), *reh'g denied*, 12-1047, 2013 WL 4045219 (U.S. Aug. 12, 2013) (internal quotations omitted). Accordingly, viewing the evidence, including his most recent affidavit, in the light most favorable to James, he raises a genuine issue of material fact as to whether his bankruptcy filing omission was the result of mistake or inadvertence.

James cannot, however, escape judicial estoppel entirely. His second counterclaim (for fraud) alleges Anderson and CornerStone strung him along for nine years, inducing him to move his family from Missouri to California and work for CornerStone on the basis of continued fraudulent promises to make good on the purported contract formed in 2003. Similarly, his fifth claim (under Labor Code § 970) seeks moving expenses on grounds that he was induced to relocate based on a misrepresentation of employment. It is not apparent that when he first filed for bankruptcy in 2005, he was aware of these claims; after all, James contends he did not learn of counter-defendants' misrepresentations until much later. He was, however, plainly aware of these claims when he amended his bankruptcy schedules in June 2013. "The debtor's duty to disclose potential claims as assets does not end when the debtor files schedules, but instead continues for the duration of the bankruptcy proceeding." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 785 (9th Cir.

2001). James' reopened bankruptcy proceedings are ongoing. Regardless of what James knew in 2005, he *now* knows that these are claims he could have brought in 2005 after moving to California and beginning to work for CornerStone.[2] Accordingly, he was under an obligation to amend his schedules to reflect the second and fifth counterclaims. *See Vertkin v. Wells Fargo Home Mortgage*, C 10-00775 RS, 2010 WL 3619798 (N.D. Cal. Sept. 9, 2010).

B. <u>Standing</u>

While James is not judicially estopped from pursuing the bulk of his allegations, his counterclaims face another, more fundamental problem: he no longer owns several of the interests he now seeks to vindicate. In an order issued October 21, 2013, CornerStone and James were directed to submit further briefing addressing James' standing to advance his counterclaims. (ECF No. 224). Now that James has lost his bid to purchase the amended assets from the bankruptcy estate, CornerStone contends James lacks standing to bring any counterclaim premised on, or flowing from, those assets.

When a debtor files for bankruptcy protection, "an estate is created, which is comprised of all of the debtor's property interest at the time of filing." *Vertkin*, 2010 WL 3619798, at *3 (quoting *In re Kottmeir*, 240 B.R. 440, 442 (Bankr. M.D. Fla. 1999)) (quotation marks omitted). The property of a bankruptcy estate includes "all legal or equitable interest of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The scope of Section 541 "is broad, and includes causes of action." *Sierra Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 707 (9th Cir. 1986) (citing *United States v. Whiting Pools Inc.*, 462 U.S. 198, 205 n. 9 (1983)).[3] Estate

---

[2] It is not apparent that this same reasoning applies to his other counterclaims. For example, his first counterclaim alleges breach of an oral contract for, among other things, a contingent stake in CornerStone. Unlike the second and fifth counterclaims, which could have been brought in 2005, much of this counterclaim is premised on alleged breaches that occurred in subsequent years. Although CornerStone argues to the contrary, it is unclear whether James was obligated to list his first, third, eighth, fourteenth, sixteenth, and seventeenth counterclaims on his amended bankruptcy schedules. In any event, as discussed below, James nonetheless lacks standing to pursue much of the relief he seeks under these counterclaims.

[3] The debtor's assets may also include claims for relief that have arisen in the interim period between the initial bankruptcy petition and the final relief from debt. *Kottmeier*, 240 B.R. at 442. If an asset comes into being after a debtor files the Chapter 7 petition, "the debtor is well-advised to amend [his or her] schedule of assets accordingly, for the effect of failure to schedule an asset is that the Debtor cannot later claim it has been abandoned by the Trustee in favor of the Debtor." *Id.*

property also includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the estate," as well as "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(6)-(7).

Once an individual declares bankruptcy, any legal or equitable interests he or she had in a particular property belongs to the bankruptcy estate, as represented by the bankruptcy trustee. *See Turner v. Cook*, 362 F.3d 1219, 1225–26 (9th Cir. 2004) (concluding that an individual who declared bankruptcy did not have standing to bring an appeal). Accordingly, when James declared bankruptcy in 2005, his property interests became part of the bankruptcy estate. His recently-amended schedules reflect two "new" interests: (1) a "contingent" interest in CornerStone and (2) an executory contract to work as manager for CornerStone in exchange for 50% of net profits in, and sale proceeds of, the company. There is no dispute that these scheduled interests, whatever their value, were property of the bankruptcy estate during the auction held January 13, 2014. Nor is there any question that CornerStone now owns these interests. What is less immediately clear, however, is how these developments affect the viability of James' numerous counterclaims.

### *i.    First Counterclaim*

James' first counterclaim alleges breach of an oral agreement containing two main components: (i) the "Mary Anderson Contract," giving James a stake in CornerStone in exchange for his agreement to move to California, purchase a staffing company, and get CornerStone off the ground, and (ii) the "CornerStone Employment Contract," under which James is entitled to a yearly salary, supplemented by a cut of net profits over a certain amount, for his work at the company. According to the First Amended Counter-Complaint (FACC), James' alleged interest in both profit-sharing and CornerStone sale proceeds is untethered from his continued work at the company:

> In the event that Mr. James' employment with CornerStone is terminated for any reason, his interest in the profit sharing and sale proceeds will continue until the company is sold and the proceeds have been distributed.

(FACC, ECF No. , ¶ 26(10)). Accordingly, to the extent James was at any point entitled to CornerStone's profits, or its proceeds upon sale, that entitlement is rooted in the oral contract alleged in the first counterclaim.

Although James does not specify a date on which the alleged oral contract was formed, there is no dispute that the agreement arose prior to his bankruptcy filing. As such, the entirety of James' claimed interest in CornerStone profits and sale proceeds, which allegedly originated in a pre-petition oral contract, became property of the bankruptcy estate.[4] Because James no longer owns these interests, he lacks standing to vindicate them via a breach of contract counterclaim. James disagrees, arguing he "should" have standing because the 2005 omission of his pre-petition interest in CornerStone was "inadvertent or mistaken." (James Supp. Br., ECF No. 267, 13:26-28). His supplemental brief, which was supposed to address standing specifically, instead emphasizes the significant difference in CornerStone's pre- and post-2005 value, James' state of mind surrounding the initial scheduling omission, and the allegedly unfair "windfall" that counter-defendants will receive if he cannot pursue his pre-petition interests. These arguments miss the point entirely, as they are completely irrelevant to whether there is a "case" or "controversy" surrounding James' claim that he is entitled to certain profits and proceeds of CornerStone. *See* U.S. Const. art. III, § 2, cl. 1. Unlike judicial estoppel, Article III standing is not a discretionary or equitable doctrine. Rather, it is a "jurisdictional" requirement that can "neither be waived by the parties nor ignored by the court." *Yakima Valley Mem'l Hosp. v. Washington State Dep't of Health*, 654 F.3d 919, 932, n. 17 (9th Cir. 2011). Here, James sues to vindicate some interests that simply are no longer his. As such, he lacks standing to litigate whether counter-defendants CornerStone and Anderson breached the alleged contract regarding James' interest in the company and its profits.

This does not, however, doom the entirety of his first counterclaim, because James requests more than a portion of CornerStone's profits and value: he also seeks "unpaid wages and reimbursements[.]" (FACC ¶ 36). Unlike his alleged interest in future profits, James' supposed entitlement to a yearly salary is tethered to his continuing work at the company. Because the

---

[4] For purposes of determining what constitutes estate property, it is immaterial that James' amended schedules characterize his interest in CornerStone as "contingent." *See Siegel v. FDIC (In re IndyMac Bancorp Inc.)*, 2012 Bankr. LEXIS 1462, 34 (Bankr. C.D. Cal. Mar. 29, 2012) ("Case law further confirms that '[a] debtor's contingent interest in future income has consistently been found to be property of the bankruptcy estate,' because 'every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541.'") (quoting *In re Yonikus*, 996 F. 2d 866, 869 (7th Cir. 1993)).

Bankruptcy Code excludes from the bankruptcy estate "earnings from services performed by an individual debtor after the commencement of the case," James' bankruptcy did not extinguish his right to collect a flat post-petition salary for post-petition work he performed for CornerStone. *See* 18 U.S.C. 541(a)(6).[5]

In sum, James lacks standing to pursue his alleged interest in CornerStone, including his purported right to certain yearly profits. Nonetheless, to the extent James formed a valid oral contract promising a yearly salary and reimbursements during his tenure at CornerStone, the bankruptcy developments do not deprive him of standing to pursue these very particular benefits of the alleged bargain. However, it is not at all clear that James, who was apparently paid handsomely until his 2012 termination, has a colorable claim under this theory.[6] Nonetheless, CornerStone's motion provides no basis to conclude that this particular theory is foreclosed.

      *ii.*    *Other Counterclaims Affected by James' Bankruptcy*

Like the first counterclaim, a handful of other counterclaims are premised in part on James' alleged interest in CornerStone's profits or sale value. To the extent the third counterclaim (for wrongful termination) seeks in part "unpaid profit sharing," such relief is foreclosed. To the extent the eighth counterclaim (for unjust enrichment) alleges James is entitled to the company's net profits and a portion of the net value, it fails. James' potential relief under the fourteenth counterclaim (for a constructive trust) is similarly circumscribed. While none of these three counterclaims fail completely, James' bankruptcy significantly hampers his ability to procure relief under any of them.

---

[5] By contrast, when postpetition services are not necessary to obtaining the payments at issue, such payments are "rooted in the pre-bankruptcy past" and therefore included in the estate. *In re Wu*, 173 B.R. 411, 414 (B.A.P. 9th Cir. 1994) (quoting *In re Ryerson*, 739 F.2d 1423, 1426 (9th Cir. 1984)) (quotation marks omitted). Such is the case with James' claimed interest in CornerStone and its profits, as James contends neither interest was dependent on his postpetition services. *See In re Viet Vu*, 245 B.R. 644, 649 (B.A.P. 9th Cir. 2000) ("[U] nder § 541(a)(6), postpetition appreciation is property of the estate without regard to whether there is equity in the property as of the petition date.").

[6] Confusingly, James contends that if Anderson now possesses his pre-petition interest in CornerStone, the company's value as of 2005—when his bankruptcy was initiated—"will need to be litigated." (James Supplemental Brief, ECF No. 267, 7:25). Accordingly, James requests that if CornerStone's motion is granted, discovery be reopened on the limited basis of discerning the company's value in 2005. It is far from apparent that discovery into the 2005 value of CornerStone is warranted for any purpose. Accordingly, James' request is denied.

The sixteenth counterclaim (for breach of fiduciary duty) proceeds on the theory that James is a "*de facto* 50% owner" of CornerStone. (FACC ¶ 146) (emphasis in original). Similarly, James' seventeenth counterclaim (for an accounting) avers that "[a]s the owner of a 50% interest in CornerStone, Mr. James is entitled to a complete accounting of its profits and losses, as well as assets." (FACC ¶ 151). Because these counterclaims for relief are premised entirely on his alleged interest in the company, they cannot proceed.

James also lacks standing to pursue his second and fifth counterclaims. These counterclaims, although discovered post-petition, could have been brought at the time the petition was filed. As such, they became property of the bankruptcy estate and were subsequently sold to CornerStone during the January 2014 "quitclaim" auction, so James cannot now pursue either counterclaim.

C. Statute of Frauds

CornerStone next contends that two of James' counterclaims are barred by California's statute of frauds, which deems certain classes of contracts invalid unless they are "in writing and subscribed by the party to be charged[.]" Cal. Civ. Code § 1624.

*i.   Oral Employment and Ownership Contracts*

CornerStone argues that James' first counterclaim, alleging breach of his oral employment and ownership contracts with CornerStone and Anderson, fails because the alleged agreements were not to be performed within one year. *See id.* § 1624(a)(1). James does not dispute that these oral contracts fall within the subject matter of the statute. Instead, he contends CornerStone and Anderson should be estopped from asserting the statute of frauds as a defense.

A party may be equitably estopped from invoking the statute of frauds if "(a) the promisee *detrimentally relied* on the agreement and would suffer an *unconscionable injury* if the oral agreement were not enforced *or* (b) the promisor would receive *unjust enrichment* if allowed to retain the benefit of the promisee's performance without abiding by the promisor's obligations under the oral agreement." *Kane v. DeLong*, 2013 WL 1149801 (N.D. Cal. 2013) (quoting *Estate of Housley*, 56 Cal. App. 4th 342, 359 (1997) (emphasis in original)). James asserts that his oral employment and ownership agreements were never reduced to writing because Anderson strung him

along for years, repeatedly promising that the terms of his employment and part ownership in the company would be memorialized in a written agreement. According to James, after moving his family from Missouri to California on the basis of the original oral contract, he only persisted to work for CornerStone, ultimately growing the business into a highly profitable enterprise earning $100 million in annual revenue, because of Anderson's repeated assurances that their original oral agreements would be honored. Unless CornerStone is estopped from asserting the statute of frauds, James argues, he will be unconscionably deprived of his fair share of CornerStone profits, and Anderson will be unjustly enriched by reaping the benefit of James' hard work.

Even if the oral agreement is enforced, it will not alter the fact that James, due to lack of standing, is not entitled to any interest in CornerStone. As such, it cannot be said that he will suffer an unconscionable injury "*if* the oral agreement were not enforced." *See Housley*, 56 Cal. App. 4th at 359 (emphasis added). However, to the limited (and apparently unlikely) extent James was not paid salary and reimbursements for his services, CornerStone may have "retained the benefit of the promisee's performance" without abiding by its obligations under the oral agreement. *See id.* Counter-defendants argue that neither CornerStone nor Anderson could have been unjustly enriched because James was paid millions during his tenure at the firm. Because "[n]o unjust enrichment results when the promisee has received the reasonable value of his services," CornerStone reasons that James' significant earnings should bar his estoppel argument. *See Ruinello v. Murray*, 36 Cal. 2d 687, 690, 227 P.2d 251 (1951). However, when viewing the evidence in a light most favorable to James, CornerStone has failed to establish that, as a matter of law, James will be unable to demonstrate unjust enrichment in his attempt to estop enforcement of the statute of frauds.

###### ii.   The Sunbury House Contract

The parties reiterate their earlier positions noted above when it comes to James' ninth counterclaim alleging breach of an oral contract requiring Mary Anderson to transfer title of the Sunbury House. CornerStone asserts, and James does not dispute, that an oral agreement to transfer real property falls within the statute of frauds. *See* Cal. Civ. Code § 1624(a)(3). James, however, contends that Anderson should be estopped from invoking the statute.

Notwithstanding the statute of frauds, "the oral agreement for the transfer of an interest in real property is enforced when the buyer has taken possession of the property and either makes a full or partial payment of the purchase price, or makes valuable and substantial improvements on the property, in reliance on the oral agreement." *Sutton v. Warner*, 12 Cal. App. 4th 415, 422, 15 Cal. Rptr. 2d 632, 636 (1993) (quoting 1 Miller & Starr, Cal. Real Estate 2d (1989) § 1:60, p. 168.) (internal quotations omitted). James took possession of the Sunbury House for several years, during which time he claims to have spent over $30,000 making improvements to the property. These actions were taken, James alleges, in reliance on Mary Anderson's promise to convey title in the Sunbury House. CornerStone's motion does not contest these factual allegations, and it thus fails to establish that, as a matter of law, James cannot estop CornerStone from invoking the statute of frauds.

D. Statute of Limitations

CornerStone next argues that James' two contract-based counterclaims are barred by California Code of Civil Procedure § 339(1), which imposes a two-year limitations period for claims premised on an oral contract. CornerStone contends that because James' purported oral contracts were breached prior to 2010, more than two years before James first asserted his counterclaims in May 2012, the statute must preclude recovery. In response, James advances an argument that echoes his defense to the statute of frauds: Anderson's manipulative conduct, by virtue of inducing detrimental reliance on his behalf, should estop CornerStone from invoking the statute of limitations.

*i. Oral Employment and Ownership Contracts*

Equitable estoppel "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) (internal quotations and citations omitted). "[O]ne cannot justly or equitably lull his adversary into a false sense of security and thereby cause him to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused by his conduct as a defense to the action when brought[.]" *Cnty. of Santa Clara v. Vargas*, 71 Cal. App. 3d 510, 524, 139 Cal. Rptr. 537, 545 (Ct. App. 1977). James alleges that

Anderson dissuaded him from suing on his employment and ownership agreements by repeatedly assuring him, year after year, that his share of CornerStone's profits and proceeds were forthcoming. In support of his motion, James submits a declaration explaining that because Anderson was a close family member, he trusted her continued representations that his contract would be honored.

CornerStone maintains that James' recent affidavits are false. In particular, CornerStone highlights a significant tension between some of James' statements: while James' most recent declaration contends that Anderson "repeated her promises that she would deliver [his] share and a written contract" on a yearly basis, he claimed in an earlier interrogatory that every year, Anderson refused to give him the annual distribution he was expecting under the contract. (James Decl. ¶ 9, ECF No. 203; Martin Decl., ECF No. 208, Exh. D., 8:10-16). CornerStone again underscores inconsistencies in the record to undermine Larry James' credibility. CornerStone has not, however, established that James cannot, as a matter of law, crest the bar of the statute of limitations. Viewing the evidence in a light most favorable to the nonmoving party, James has raised a genuine issue of material fact on this defense: did his aunt make representations that "lulled" him into a false sense of security, such that Anderson should be estopped from invoking the statute of limitations? As with so many other aspects of this dispute, the parties' positions hinge in part on determinations of credibility. Because "summary judgment is singularly inappropriate where credibility is at issue," James' first counterclaim is not barred by the statute of limitations. *See S.E.C. v. M & A W., Inc.*, 538 F.3d at 1054-55 (9th Cir. 2008).

    *ii. The Sunbury House*

James' evidence supporting the ninth counterclaim, however, is less compelling. By 2008, he realized that Anderson would not honor the purported oral contract to transfer the Sunbury House. Even so, and even after moving his family out of the home, James apparently continued to believe that he would be compensated for the money he would have received as a tax benefit. In support of this contention, he submits a 2006 email from Anderson's accountant Paul Danis stating that the house could be given to James "to compensate Larry for the tax loss." (ECF No. 203, Exh. 16). James also submits an email he sent to Mary Anderson in 2009 concerning, among other things, her unfulfilled promise to give him title to the house. He does not, however, submit any

1 evidence demonstrating that Anderson or her agents reaffirmed their promises after James
2 discovered the breach.  Even if Anderson induced James to move into the house, no evidence
3 indicates that she also induced him to avoid filing claims against her.  Because James has failed to
4 introduce any evidence demonstrating that he was deceived or lulled away from filing his breach of
5 contract action within the two-year limitations period,[7] CornerStone is entitled to summary
6 judgment on the ninth counterclaim.

E. <u>Other Potential Defects in James' Counterclaims</u>

   *i. Fraud*

CornerStone argues that James cannot prevail on his fraud claim because he has not demonstrated any "out-of-pocket damages" as a result of Anderson's misrepresentations.  The company emphasizes that James was a convicted felon who had been unemployed for several years prior to partnering with Anderson to form CornerStone.  Although it concedes that James probably incurred some expense in moving from Missouri to California, the gravamen of CornerStone's fraud argument is that James, who went from being down on his luck in Missouri to earning a handsome salary as a CornerStone manager in California, has benefitted too much from his changed circumstances to demonstrate "out-of-pocket" loss.  *See Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995) ("The out-of-pocket measure of damages . . . awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received.") (internal quotations omitted).  This argument is premised on the assumption—which James disputes—that out-of-pocket damages are the appropriate remedy for his fraud claim.  According to James, he is entitled to much more: "benefit-of-the-bargain" damages to place him in the same position he would be in had Anderson's promises been true.

In California, in the absence of a fiduciary relationship, recovery for the tort of fraud is limited to the actual, out-of-pocket damages suffered by the plaintiff.  *Auble v. Pac. Gas & Elec. Co.*, 55 F. Supp. 2d 1019, 1022 (N.D. Cal. 1999) (citing *Ward v. Taggart*, 51 Cal. 2d 736, 741, 336

---

[7] As an initial matter, the parties disagree over which statute of limitations applies to this claim. James argues that instead of applying the two-year statute of limitations for oral contracts, the court should instead apply the three-year statute of limitations that applies to fraud actions. *See* Code Civ. Proc. § 338(d).  This counterclaim, however, is not for fraud—it is for breach of an oral contract. Even so, James waited longer than three years to file.

P.2d 534, 537 (1959)). The California Legislature codified this limitation in Civil Code § 3343, which provides that "the victim of fraud in the sale, purchase or exchange of property may recover only out-of-pocket losses plus certain additional damages; benefit-of-the-bargain damages may not be awarded." *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1032 (9th Cir. 1999). James argues that his fraud claim, which is premised in part on "the promises Ms. Anderson made about his interest in CornerStone," falls outside the ambit of § 3343 by virtue of being a "non-property related" fraud claim. (ECF No. 203, 21:15). Yet these promises, which concern a purported property interest in a business entity, are precisely within the subject matter of the statute. James fails to provide any authority for the notion that § 3343 does not apply to his claim. He also does not establish that Mary Anderson owed him a fiduciary duty, thus precluding him from invoking the fiduciary exception to the statute. *See Ambassador Hotel Co.*, 189 F.3d at 1032. Even when viewing the evidence in the light most favorable to James, he has failed to establish that his fraud claim can proceed.

### ii. Wrongful Termination

CornerStone also moves for summary judgment on James' wrongful termination claim, arguing that neither of James' proffered theories—direct wrongful termination or constructive wrongful termination—are viable. CornerStone does not dispute that James was terminated on March 30, 2012. It contends, however, that because James was set to resign the following day, his termination, even if wrongful, could not have resulted in any measurable damages. This argument lacks merit or logic. If James' termination was wrongful, he is entitled to damages. Such damages may be of little value, but this is immaterial. Accordingly, CornerStone fails to establish that it is entitled to summary judgment as a matter of law on James' counterclaim. Because his claim can proceed on a direct termination theory, James' alternate theory of constructive termination need not be addressed.

## V. CONCLUSION

For the aforementioned reasons, counter-defendants' motion for summary judgment is GRANTED in part and DENIED in part. To be clear, this order holds as follows:

- James lacks standing to pursue his alleged interest in CornerStone, including profit-sharing and sale proceeds. This precludes, or severely limits, many of his counterclaims.

- The first counterclaim (breach of oral contract) can proceed only to the extent James alleges breach of the purported agreement for a yearly salary and reimbursements.

- The second counterclaim (fraud) fails due to judicial estoppel and lack of standing. It is also substantively deficient, as James fails to demonstrate out-of-pocket damages.

- The third counterclaim (wrongful termination) can proceed, but James cannot use this claim to recover his alleged interest in CornerStone's profits.

- The fifth counterclaim (violation of Labor Code § 970) is barred due to judicial estoppel and lack of standing.

- The eighth counterclaim (unjust enrichment) may proceed, but not on the basis that James is entitled to a portion of CornerStone's net profits or net value.

- The ninth counterclaim (breach of the Sunbury House contract) is barred by the statute of limitations.

- The fourteenth counterclaim (constructive trust) may proceed, but not on the basis that James is entitled to a portion of CornerStone's net profits or net value.

- The sixteenth counterclaim (breach of fiduciary duty) and seventeenth counterclaim (accounting) fail because they are premised entirely on James' alleged interest in CornerStone.

In sum, CornerStone's motion is granted with respect to the second, fifth, ninth, sixteenth, and seventeenth counterclaims. Although the first, third, eighth, and fourteenth counterclaims can proceed in the limited form explained above, James' right to relief under any of these counterclaims is circumscribed by his lack of standing to vindicate an alleged interest in CornerStone. Additionally, James' request to reopen discovery is denied.

IT IS SO ORDERED.

Dated: 3/7/14

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE